IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
ONE APPLE IPHONE 6, MODEL A1549,
FCC ID BCG-E2816A, IC-579C-E2816A,
IMEI 356990061201622, CURRENTLY
LOCATED IN A SEALED ENVELOPE
BEARING BARCODE NUMBER E5887628,
AT THE MAIN EVIDENCE CONTROL
CENTER (ROOM B112), FEDERAL
BUREAU OF INVESTIGATION,
WASHINGTON FIELD OFFICE, 601 4TH
STREET NW, WASHINGTON, D.C., 20535

Misc. No. _____

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, Jonathan E. Fraller, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property – an

Apple iPhone 6 – which is currently in law enforcement's possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the United States Department of Treasury, Office of

Inspector General ("TOIG"), and have been since June 2012.  I am a 1998 graduate of the

Criminal Investigator Training Program at the Federal Law Enforcement Training Center and the

U.S. Secret Service Special Agent Training Course at the James J. Rowley Training Center.  I

have more than 11 years of federal law enforcement experience that includes being a boarding

officer with the U.S. Coast Guard, a Special Agent with the U.S. Secret Service, and in my

current position as a Special Agent with the TOIG.  I have also been a Certified Fraud Examiner

since February 2010.  During my tenure in federal law enforcement, I have conducted numerous

investigations into a variety of criminal activity, including, but not limited to, the investigation of

narcotics, money laundering, forgery, loan fraud, wire fraud, bank fraud, and other types of

fraud.  While investigating these cases, I have participated in the execution of numerous search

warrants and seized both physical and digital evidence of violations of federal law.

3.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is an Apple iPhone 6, Model A1549, FCC ID BCG-

E2816A, IC-579C-E2816A, IMEI 356990061201622, hereinafter the "Device."  The Device is

currently in a sealed envelope, bearing barcode number E5887628, at the Federal Bureau of

Investigation, Washington Field Office, Main Evidence Control Center (Room B112), 601 4th

Street NW, Washington, D.C. 20535.

5.      The applied-for warrant would authorize the forensic examination of the Device

for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### A.  Background of the Investigation

6.      This search warrant involves evidence relating to a case that is currently pending

in this Court, captioned *United States v. Yossi Avitan, Ori Saadon, Itzhak Salama, Golan*

*Chkechkov, Michael Admon, and Haviv Arazi*, 17-cr-00017 (CKK), involving a money

transmitting business, commonly referred to as a "hawala" network.  A "hawala" network is an

alternative money transmitting system conducted by brokers known as "hawaladars" that

operates outside of the traditional banking and financial systems and is premised on relationships

of mutual trust.  The hallmark of a hawala is the transfer and receipt of the value of currency without its actual physical movement.  In the United States, a hawala operator must register his/her business with the Federal Government and obtain a license from all of the States in which the business operates.

7.      In its most basic form, a hawala network involves at least two hawaladars.  A customer approaches a hawaladar and gives the hawaladar a sum of money to be transferred to the beneficiary in another city/country.  The hawaladar then contacts a hawaladar in the recipient city/country, instructs that individual to deliver equivalent funds, minus a fee, in the recipient country's currency to the beneficiary, and promises to settle the debt between the two hawaladars at a later time.  The hawaladar in the recipient city/country then contacts the beneficiary, confirms that the beneficiary is expecting the funds, and the funds are then delivered to the beneficiary.  The beneficiary/recipient of the funds typically receives the funds without producing identity documents.  The timing between delivery and pickup of funds between hawaladars can be as quick as a simultaneous transaction to a period of hours or days.

8.      In a hawala system there is no recorded agreement or written contract for the transaction and no legal means of reclamation.  Rather, the deal is secured by the trust between the parties which is often forged through familial, ethnic, religious, regional, and/or cultural bonds, and which undergirds the "honor system" that the hawala requires.  Typically, a hawala network is quite extensive, involving the transfer of many types of currencies between various hawaladars in different cities/countries and across different continents, with the value of the money moving in a variety of directions from one city/country to another.  In addition, hawaladars in the same country often "pool" together bulk currency to effect an "order" from another hawaladar if the amounts they individually possess are insufficient to satisfy an order.

9.      Each time a hawladar gives payment instructions and a transaction occurs, a debt is created.  Hawaladars typically maintain a running tally or balance sheet and settle their debts vis-à-vis one another on a regular basis.  Money inflows and outflows are generally kept in relative balance with respect to the total amount of money each hawaladar puts into the network. Settlement between hawaladars can occur in several ways.  Mostly, settlement occurs through monetary value being placed upon the "books" of a given hawaladar in either the hawaladar's home country or in another country designated by the hawaladar.  In other instances, hawaladars "settle up" with the receipt of goods, real estate, or other assets in lieu of money.

10.     Hawala networks engage in transactions where the source of the money is legitimate and those where the source and intent of the transactions are illegitimate.

11.     It is a violation of Federal law for a money transmitting business affecting interstate or foreign commerce: (a) to fail to register with the Department of the Treasury as a money transmitting business; (b) to fail to obtain a license to operate a money transmitting business in the States in which the money transmitting business operates; and (c) to knowingly transfer funds that are proceeds of illegal activity.

**B.  Background for the Investigation into the New York Hawala**

12.     Since 2011, the Federal Bureau of Investigation ("FBI"), Washington Field Office ("WFO"), has been investigating several criminal enterprises linked to Eurasian, Balkan, and Israeli organized crime groups that have conducted (and continue to conduct) worldwide cyber-enabled fraud schemes.  These criminal organizations conducted large-scale international money laundering activity through multiple international bank account transactions, wires from U.S. based bank accounts, as well as a transfers of funds from a hawala network in the United States, Europe, China, Hong Kong, and other locations.

4

13.     Historically, the targeted criminal enterprises operated a variety of schemes, including an online vehicle fraud scheme (commonly referred to as eBay or Craigslist scams) which resulted in multimillion dollar losses for hundreds, if not thousands, of victims all over the world, as well as "Business Email Compromise" (also known as "BEC" or "CEO Impersonation") schemes.  A common theme among the criminal enterprises was that victims were tricked into transferring sums of money to bank accounts controlled by members of the criminal enterprises.  The victim's money was typically quickly withdrawn in cash or rapidly transferred into bank accounts in various locations in the United States, Europe, China, and Hong Kong.

14.     Two individuals who had laundered funds related to a vehicle fraud scheme and a BEC scheme were arrested by the FBI.  Both individuals subsequently agreed to cooperate with the FBI.  They are referred to herein as "PERSON A" and "PERSON B."[1]

15.     In January 2015, in addition to providing information regarding other criminal activity, PERSON B confirmed that he/she used a hawala network, which was operated, in part, in New York to launder proceeds from a vehicle fraud scheme from the United States to locations in Europe.

16.     In June 2015, PERSON A admitted to FBI agents that he/she participated in various criminal activity, including assisting PERSON B in laundering proceeds from a vehicle fraud scheme by introducing PERSON A to the hawala network operating in New York.  FBI agents learned that, before their cooperation with law enforcement, PERSON A and PERSON B laundered illicit monies through a New York City based hawala on more than one occasion.

---

[1] We are referring to these individuals as Person A and Person B because their cases are currently under seal with this Court.

17.     The FBI learned that PERSON A has extensive contacts within the hawala network operating in the United States as well as in other countries, including Israel.  When PERSON A needed to transfer funds involved in criminal activity, PERSON A contacted several individuals located in Israel to assist in transferring funds internationally.

18.     In June 2015, PERSON A (before PERSON A's arrest and subsequent cooperation) arrived to the United States with the intent to launder the proceeds of a $1.4 million scam conducted by other individuals.  The $1.4 million of victim funds were wired into a covert law enforcement controlled bank account.  PERSON A indicated to PERSON B that he/she intended to use United States bank accounts to transfer the $1.4 million to Israel.

### C.  The Undercover Investigation of the Hawala Network

19.     After the arrest of PERSON B in January 2015, the FBI learned more about the hawala network used to launder the vehicle fraud proceeds from the United States to locations overseas.  Specifically, the FBI became aware that multiple individuals located in New York received cash that was transferred to locations in Europe.  As a result, the FBI was interested in determining the operators of the hawala network in the United States and elsewhere.  The FBI then began planning an undercover investigation of the hawala network.

20.     The FBI and TOIG worked with PERSON B to conduct an undercover operation in which $50,000 was transferred through the hawala network by delivery of cash in New York.  Specifically, in early June 2015, PERSON B contacted PERSON A (prior to PERSON A's arrest and cooperation) to gain access to the hawala network.  FBI agents learned that PERSON A was coordinating with other individuals to transfer $50,000 in funds from New York to the United Kingdom.  PERSON A was located in the District of Columbia when he/she was communicating with PERSON B and making arrangements for the monetary transfers with the hawaladars.

PERSON A informed PERSON B that the funds would be transferred in two deliveries, one in the amount of $20,000 and the other in the amount of $30,000.

21.     On or about June 11, 2015, PERSON B traveled to Brooklyn, New York, to deliver $20,000 to a New York based individual now identified as Golan Chkechkov, associated with the hawala network.  Based upon a variety of issues, PERSON B was required to retrieve the $20,000 delivered to the hawala network that same day.  On June 11, 2015, PERSON B called Chkechkov and explained that he/she had been instructed to go back and pick up the $20,000.  PERSON B then met with Chkechkov and retrieved the $20,000 from Chkechkov, but at a different location.

22.     On or about June 15, 2015, through coordination between PERSON A and an individual identified as Ori Saadon, PERSON B delivered $50,000 to the same individual that he/she delivered the $20,000 to in Brooklyn, New York (i.e., Chkechkov).  The agreement between the individuals transferring the funds was that the hawala network would convert the currency to British pounds and provide the equivalent of $50,000, minus a fee, in London, United Kingdom.

23.     Because the FBI and British law enforcement could not make arrangements to pick up the funds in London within a few days, the funds had to be retrieved from the hawala network in New York.  PERSON A contacted Saadon regarding returning the $50,000 from the hawala network.  PERSON A and Saadon then discussed conducting the transaction again at a later time.  PERSON A had additional conversations about the return of the funds with another individual, later identified as Yossi Avitan, as well.

24.     On or about June 25, 2015, Yossi Avitan directed PERSON A (who was now cooperating with the FBI and TOIG) to pick up the funds in Brooklyn, New York, by calling the

phone number 347-733-5252.  Using that phone number, PERSON A and an individual later

identified as MICHAEL ADMON discussed where the money would be picked-up, and

ADMON directed PERSON A to ADMON's business located at 1285 52nd Street, Brooklyn,

New York.  That same day, PERSON A went to that location, which was a business called

"Computer Team Inc." and picked-up $47,000 ($50,000 minus a six percent fee charged by the

hawala network for the transaction) from ADMON.  After retrieving the funds from the hawala

network, PERSON A called Saadon and told him that PERSON A had the $47,000.[2]

**D.  The Indictment and Arrest of ADMON**

25.     On January 24, 2017, a grand jury in the United States District Court for the

District of Columbia indicted ADMON and five other defendants each on one count of

Conspiracy to Operate an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. §§

2, 371, 1960(a).  The case is captioned *United States v. Yossi Avitan, Ori Saadon, Itzhak Salama,*

*Michael Admon, and Haviv Arazi*, 17-cr-00017 (CKK).  On that same day, a United States

Magistrate Judge issued a warrant for ADMON's arrest.

26.     On March 1, 2017, FBI and TOIG special agents, including your affiant, executed

the arrest warrant for ADMON at his residence located at 3612 15th Avenue, Brooklyn, New

York.  Prior to gaining entry to the residence, I called the phone number 347-733-5252 three

times from my cellular phone, which has the number 202-439-0183.  Each time, there was no

answer.  On at least one of those three phone calls, I heard the personalized voice mail use the

---

[2] The FBI and TOIG then performed another undercover transfer of money through a hawala in Los Angeles,
California.  That transfer, while charged in the indictment naming ADMON, is not relevant to this search warrant
application.

name "Mike" or "Michael," which is ADMON's first name.  Notably, the phone number that I called was the same number that PERSON A called to reach ADMON on June 25, 2015 as part of the undercover operations.

27.     After the residence was secured and ADMON was in custody, I again called 347-733-5252 and no one answered.  A short time later, I read ADMON his *Miranda* rights and, at 6:24 AM, ADMON signed an FD-395, Advice of Rights form, stating that he understood his rights and was willing to answer questions without a lawyer present.

28.     FBI Special Agents Ben Sedam and Chris Melia then went upstairs with ADMON's wife to retrieve ADMON's passports, which were in their bedroom.  Upon entering their bedroom, Special Agent Sedam noticed two cell phones on each of their nightstands.  Special Agent Sedam then told ADMON's wife that ADMON might want his cell phone with him and asked if one of the cell phones belonged to ADMON.  ADMON's wife then grabbed one of the cell phones and handed it to Special Agent Melia, who then went downstairs and gave the phone to me.

29.     This iPhone (hereinafter, the "Device") had a blue protective case and a blue screen protector.  ADMON read and signed, in English, an FBI form FD-26, Consent to Search form, for the Device, his business, and his two vehicles.  ADMON was also shown FBI form FD-26.29, Consent to Search, written in Hebrew.  At or about this time, ADMON stated that the code to unlock the Device was the same as the address for his business, "1285."

30.     At or about 6:36 AM, I pressed the "Home" button on the Device and saw a banner showing four missed calls from my cell number, 202-439-0183.  After taking a photograph of that banner, I successfully unlocked the phone using the code "1285."  FBI special

Agents and I then transported ADMON to the FBI New York Field Office located at 26 Federal Plaza, New York, New York, for routine processing.

31.     At or about 9:15 AM, the FBI attempted to image the Device but was unable to do so because the FBI did not have the password for ADMON's iCloud account.  I then asked ADMON for his iCloud account password.  ADMON provided several variations of the password for his Apple ID account, as well as the password to an application on the Device that contained all of his passwords.  None of the passwords that ADMON provided worked.

32.     At that time, I used the "1285" code provided by ADMON to unlock the Device to review and record some of its contents (i.e., contents that were directly on the Device and not stored on the iCloud).  One of ADMON's contacts was defendant Chkechkov, who PERSON B interacted with initially on June 11, 2015, as part of the undercover operations.  In the contact information for Chkechkov on the Device, ADMON had a photograph of Chkechkov, Chkechkov's known address of 1333 East 40th Street, Brooklyn, New York, and Chkechkov's known phone number of 646-330-3424.

33.     I then notified ADMON that I was going to seize the phone and that he could either continue to provide his consent or, if he withdrew consent, I would attempt to obtain a search warrant for the phone.  ADMON continued to provide consent, stating that he did not want to create extra work for me.

34.     FBI special agents and I transported ADMON to the U.S. District Court for the Eastern District of New York for further processing and his initial appearance.  While in the vehicle waiting to be admitted into the Courthouse, ADMON asked me if he could keep the SIM card for his phone.  I denied his request.

35.     After ADMON's initial appearance, I provided him with a signed copy of FBI form FD-597, Receipt for Property, for the Device.  At that time, I confirmed to ADMON's attorney, Fred Hafetz, that ADMON had consented to a search of his phone.  Hafetz stated that he would be in touch with me the following day.

36.     At or about 11:25 AM on March 2, 2017, I received a phone call from Hafetz revoking consent to search ADMON's phone.  Hafetz followed-up that call with an email to me at 11:35 AM stating the same.  Following the phone call from Hafetz, I did not access the Device.

37.     The Device is an Apple iPhone 6.  I further identified the Device by the following information etched on the back: Model A1549, FCC ID BCG-E2816A, IC-579C-E2816A, IMEI 356990061201622.  The Device is currently in storage in a sealed envelope bearing barcode number E5887628, at the FBI's Washington Field Office, Main Evidence Control Center (Room B112), 601 4th Street NW, Washington, D.C.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into my possession.

38.     We are respectfully seeking the instant search warrant into the Device because the same Device was likely used by ADMON to communicate with PERSON A to set-up the return of the money attempted to be transferred as part of the undercover operation occurring in June 2015.  Among other things, the Device likely contains evidence showing that ADMON is connected to other members of the hawala, such as Chkechkov (whose contact information was found on the phone already prior to ADMON's revocation of consent).  In addition, call logs on the Device may show who ADMON communicated with on the day the money was returned to

PERSON A, in the process identifying ADMON's co-conspirators and establishing ADMON's

overall role in the conspiracy.

## TECHNICAL TERMS

39.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

telephone) is a handheld wireless device used for voice and data communication

through radio signals.  These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones.  A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and

from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include: storing

names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

40.  Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://support.apple.com, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, and PDA.  In my training and

14

experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

41.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

42.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

15

c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

43. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and

passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17

44.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

45.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

46.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____

Jonathan E. Fraller
Special Agent, U.S. Department of Treasury,
Office of Inspector General

Subscribed and sworn to before me
on March 31, 2017:

_____

HON. DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

18

**ATTACHMENT A**

The property to be searched is an Apple iPhone 6, Model A1549, FCC ID BCG-E2816A, IC-579C-E2816A, IMEI 356990061201622, hereinafter the "Device."  The Device is currently in a sealed envelope, bearing barcode number E5887628, at the Federal Bureau of Investigation, Washington Field Office, Main Evidence Control Center (Room B112), 601 4th Street NW, Washington, D.C. 20535. 20535.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of

18 U.S.C. §§ 2, 371, 1960(a) and involve MICHAEL ADMON, including:

     a.   Any records or information relating to ADMON's participating in a conspiracy to

        operate an unlicensed money transmitting business in violation, involving, among

        other people, Golan Chkechkov, Ori Saadon, and Yossi Avitan, as discussed in

        the indictment charging ADMON, captioned *United States v. Yossi Avitan et al.*,

        17-cr-00017 (CKK).

     b.   lists of customers and related identifying information;

     c.   types, amounts, and prices of money transferred or transmitted as well as dates,

        places, and amounts of specific transactions;

     d.   any information related to the sources of money being transferred (including

        names, addresses, phone numbers, and any other identifying information);

     e.   any information recording ADMON's contact with his fellow co-conspirators as

        discussed in the indictment against ADMON captioned *United States v. Yossi*

        *Avitan et al.*, 17-cr-00017 (CKK);

     f.   all bank records, checks, credit card bills, account information, and other financial

        records.

2.      Evidence of user attribution showing who used or owned the Device at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.